UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
                                    :
MICHAEL ISRAEL,
                                    :
                 Plaintiff,
                                    :
          - against -
                                    :     04 Civ. 4599 (DC)
SURINDER CHABRA and PARAN REALTY
CORP.,                              :

                 Defendants.        :

- - - - - - - - - - - - - - - - - -x      **OPINION**
                                    :
STEVEN ISRAEL,
                                    :
                 Plaintiff,
                                    :
          - against -
                                    :     04 Civ. 5859 (DC)
SURINDER CHABRA and PARAN REALTY
CORP.,                              :

                 Defendants.        :

- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**    SKLOVER & ASSOCIATES, LLC
                    Attorneys for Plaintiffs
                         By:  Alan L. Sklover, Esq.
                    10 Rockefeller Plaza, Suite 816
                    New York, New York  10020

                    NOVAK JUHASE & STERN
                    Attorneys for Defendants
                         By:  G. Alexander Novak, Esq.
                    483 Chestnut Street
                    Cedarhurst, New York  11516

**CHIN, D.J.**

        In these diversity actions, plaintiffs Michael Israel
and Steven Israel were formerly employed by AMC Computer
Corporation ("AMC").  AMC agreed to pay them certain bonuses, in
installments over time, with interest.  AMC's president,
defendant Surinder ("Sonny") Chabra, guaranteed the payments.

AMC met its obligations for a while, but eventually stopped paying. Plaintiffs brought this action to enforce the guarantees against Chabra. They also assert an "alter ego" claim against defendant Paran Realty Corp. ("Paran"), contending that Chabra fraudulently transferred his assets to Paran to hide them.

Chabra admits that he guaranteed AMC's obligation to pay the bonuses, but argues that AMC actually overpaid plaintiffs because the governing agreements provided for a variable rate of interest rather than the higher fixed interest rate relied on by plaintiffs. He contends further that plaintiffs failed to give him notice of AMC's default, as required by the guarantees, and that plaintiffs changed the terms of the payout without his consent.

Plaintiffs move for summary judgment, arguing, inter alia, that the governing agreements clearly provide for a fixed rate of interest -- prime plus 1% as of the date a contemplated merger closed. Plaintiffs also move for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. Defendants cross-move to dismiss or stay these actions.

Chabra's arguments are meritless. Indeed, defendants have engaged in a pattern of delay and obfuscation, repeatedly making frivolous arguments and engaging in tactics designed solely to frustrate plaintiffs' efforts to hold defendants accountable for their obligations. Plaintiffs' motion for summary judgment is granted, to the extent set forth below. Plaintiffs' motion for sanctions is denied, but primarily because

I need not decide the issues presented, for plaintiffs are entitled to their fees and costs as a contractual matter, under the applicable agreements. Defendants' cross-motion to dismiss or stay these proceedings is denied.

## BACKGROUND

### A.  The Facts

The facts are largely undisputed. They are drawn from the pleadings as well as the motion papers and supporting materials. All conflicts in the evidence have been resolved in favor of defendants, where defendants have presented admissible evidence to support their position.

On May 1, 2000, plaintiffs entered into separate but parallel employment agreements with AMC (the "Employment Agreements"). (PX E-1, E-2).[1] Plaintiffs also signed, together with Chabra, AMC, and AMC Investors LLC (the "LLC"), a "Letter of Intent" (the "Letter of Intent"). (PX D). The Employment Agreements and Letter of Intent (together, the "Agreements") included provisions regarding plaintiffs' duties, conditions of employment, and salaries and bonuses. (See Def. Mem. at 3). The Letter of Intent provided, in ¶ 5, that if the LLC made a certain investment in AMC, plaintiffs each would be entitled to a $2

---

[1]     "PX" and "DX" refer to, respectively, plaintiffs' exhibits annexed to their memorandum of law and defendants' exhibits included in their binder of motion papers. "Pl. Mem." refers to Plaintiffs' Memorandum of Law in Support of their Motion for Summary Judgment. "Def. Mem." refers to Defendants' Memorandum of Law in Support of their Cross-Motion for Dismissal and in Opposition to Plaintiffs' Motion for Summary Judgment.

million bonus, to be paid by Chabra, in 36 monthly installments.
The payments were to be evidenced by promissory notes that would
accrue interest "at an annual rate equal to the prime rate plus
1%." (PX D at ¶ 5). Chabra also agreed "to pay all reasonable
costs incurred in connection with the collection of amounts
payable under such promissory notes." (<u>Id.</u>).

On July 31, 2000, the Agreements were modified, by
documents entitled "Amendment No. 1 to Employment Agreement" and
"Amendment No. 1 to Letter of Intent," with separate sets for
each plaintiff. (PX F-1, F-2, H-1, H-2 (collectively, the "First
Amendment")). Amendment No. 1 to the Employment Agreement
provided that, upon the completion of a certain merger, each
plaintiff would be entitled to a $1.75 million bonus. (PX F-1,
F-2 at § 3.4). It further provided:

> Such bonus payment will be payable over three
> years in the manner set forth below, with
> interest accruing at a rate equal to the
> Prime Rate plus 1%. "Prime Rate" means the
> prime rate of interest as set forth in The
> Wall Street Journal <u>on the date of the
> Closing</u>.

(<u>Id.</u>) (emphasis added). AMC also agreed to pay "all reasonable
costs incurred in connection with the collection of amounts
payable under" the bonus provision. (<u>Id.</u>).

Amendment No. 1 to the Letter of Intent replaced ¶ 5 in
the Letter of Intent with a new ¶ 5, providing that, upon the
completion of the restructuring transaction, plaintiffs would
each "be entitled to receive the payments set forth in Amendments
to Employment Agreements between AMC and [plaintiffs] . . . .

Sonny Chabra shall guaranty the[se] payments. . . ."  (PX H-1, H-2).  In essence, the First Amendment modified the Agreements by reducing the bonus for each plaintiff from $2 million to $1.75 million, making AMC (rather than Chabra) responsible in the first instance for paying the bonuses, and providing that Chabra would guarantee the payments.

On August 25, 2000, Chabra executed personal guarantees (the "Guarantees") for those bonus payments.  (PX I-1, I-2). Specifically, the Guarantees provided that

> Surinder (Sonny) Chabra ("Guarantor") hereby absolutely, unconditionally and irrevocably guarantees to [plaintiffs] (i) the full, due and punctual payment, whether at stated payment dates, by acceleration or otherwise, of any amounts owed under Section 3.4 of the Employment Agreement (including interest as described therein), and (ii) the prompt reimbursement of or payment for any and all losses, costs, damages, claims, expenses and liabilities (including reasonable attorneys' fees) incurred by [plaintiffs] in enforcing any rights under [these] Guarant[ees] . . . , and further guarantee that any such amounts shall be paid when due without presentation, demand, notice or protest of any kind . . . ; provided, however, that [plaintiffs have] given Guarantor written notice ("Notice") of AMC's failure to pay any Obligation within 60 days of the occurrence of each failure. Guarantor will then have 30 days to make such payments (or to cause AMC to make such payments).
>
> . . . . The liability of the Guarantor under [these] Guarant[ees] shall be absolute and unconditional irresepective of (i) the failure of [plaintiffs] to assert any claim against AMC or the Guarantor under the provisions of the Employment Agreement or the Obligations, or any change in the time, manner or place of payment of, or in any other term of, all or any such provisions o[f] the Obligations; (ii) any lack of

> validity or enforceability of the Employment
> Agreement; [and] (iii) any recision, waiver,
> or modification of any of the terms or
> provisions of the Employment Agreement or the
> provisions of [these] Guarant[ees]. . . .

(Id.). The Guarantees further provided that "[r]eferences to the Employment Agreement shall mean the Employment Agreement immediately after the execution of Amendment No. 1 and shall not be affected by subsequent amendments to the Employment Agreement unless Guarantor has agreed in writing to such amendments." (Id.).

Over the course of the next two-and-a-half years, AMC made certain of the bonus payments, albeit with difficulty. On February 26, 2003, March 5, 2003, and March 17, 2003, plaintiffs sent notices of default to AMC. Copies were sent to Chabra, both individually and as President and CEO of AMC. (Novak 1/27/06 Aff. Ex. A).

On April 30, 2003, the Agreements were further amended, by documents entitled "Second Amendment to Employment Agreement" (the "Second Amendment"). (PX J-1, J-2). The Second Amendment acknowledged that "the First Amendment, at section 3.4 grants [plaintiffs] the right to receive a $1,750,000 bonus payment upon the closing of a certain merger, which has occurred, in consideration for past services, payable over three years and bearing interest at rate of prime rate plus 1%." (PX J-1, J-2). The Second Amendment did not describe the interest rate as floating, variable, or fixed. (Id.). The Second Amendment then recited that AMC had not made the bonus payments as required

under the Agreements.  The Second Amendment provided:

> [AMC] and [plaintiffs] agree and acknowledge
> that the amount of unpaid Bonus Payment,
> including accrued and unpaid interest
> thereon, . . . is $713,621.49.  The parties
> hereto agree that at this time it is in the
> best interests of [AMC] and [plaintiffs] that
> a new payment schedule be agreed to rather
> than resorting to arbitration or other
> remedies.

(Id.).  An interest rate of 10.5% was used to calculate the

accrued and unpaid interest to arrive at the balance due and

owing of $713,621.49.  This was the only interest rate used.

(Pl. 2/27/06 First Letter to Court at 1 & Ex. B).[2]

The Second Amendment then set forth a revised payment

schedule for the bonus payments, which included an interest

calculation.  (PX J-1, J-2).  The new schedule used a rate of

10.5% to calculate the interest amounts; no other interest rate

was used.  (Pl. 2/27/06 First Letter to Court at 2 & Ex. B).

Chabra signed the Second Amendment, as President of AMC.  (PX J-

1, J-2).  The Second Amendment noted that all other obligations

under the First Amendment and the Employment Agreements were

unaffected, and that the Guarantees "shall continue in full force

and effect."  (Id.).[3]

---

[2]    As discussed below, plaintiffs' counsel submitted two
letters to the Court on February 27, 2006, the first responding
to the Court's February 24, 2006, request for information and the
second opposing defendants' request to file answers out-of-time.

[3]    Apparently, in July 2003, there was some discussion of
a "revised payment schedule," but no document was signed by
plaintiffs or Chabra.  (See PX K; Pl. Mem. at 8 n.8).  Because
defendants do not acknowledge this purported July 2003
modification, I do not rely on it.

AMC made some but not all the required payments. The last bonus payment it made was on February 15, 2004, to both plaintiffs. (PX A ¶ 8; PX B ¶ 8).[4] It did not make the March payment or any payment thereafter, and plaintiffs sent AMC notices of default on March 31, 2004, April 1, 2004, April 7, 2004, May 4, 2004, May 12, 2004, June 17, 2004, July 12, 2004, July 20, 2004, and August 23, 2004. (PX L; see PX A ¶¶ 9, 11; PX B ¶¶ 9, 11). Plaintiffs also sent notices and demands to Chabra, invoking the Guarantees, on virtually identical dates, March 31, 2004, April 1, 2004, April 7, 2004, May 5, 2004, May 12, 2004, June 17, 2004, July 12, 2004, July 20, 2004, and August 23, 2004. (PX M; see PX A ¶ 10; PX B ¶ 10).

**B.    Prior History and Other Proceedings**

On May 18, 2004, plaintiffs commenced arbitration proceedings against AMC before the American Arbitration Association (the "AAA") to collect on the unpaid bonus payments. The Employment Agreements contained a mandatory arbitration clause. (PX E-1, E-2 at § 9.10).

Michael Israel filed his complaint in this Court on June 18, 2004, and Steven Israel filed his complaint in this Court on July 28, 2004.[5] Plaintiffs thereafter moved for partial

_____

[4]    Both plaintiffs recall specifically when AMC stopped making payments. (PX A ¶ 8; PX B ¶ 8). In contrast, Chabra states in his affidavit: "To this date I do not know when AMC made payments to the plaintiffs and when they stopped." (DX 2 ¶ 26).

[5]    Michael Israel is a citizen of New Jersey and Steven Israel is a citizen of Florida. (PX A at 1; PX B at 1). Chabra is a citizen of New York and Paran is a New York corporation with

summary judgment and defendants moved to compel arbitration.
Plaintiffs objected to arbitration, because Chabra and Paran were
not parties to the Employment Agreements (which contained the
mandatory arbitration clause) and the Guarantees did not contain
an arbitration clause; to the contrary, in the Guarantees Chabra
explicitly consented to the exclusive jurisdiction of the federal
and New York State courts.  (PX I-1, I-2).

        By memorandum decision dated March 9, 2005, I granted
defendants' motion to compel arbitration and denied as moot
plaintiffs' motion for partial summary judgment.  Israel v.
Chabra, 04 Civ. 4599 (DC), 2005 WL 589400, at *1 (S.D.N.Y. Mar.
11, 2005).  I dismissed these actions without prejudice to
reinstatement within sixty days after the final conclusion of the
arbitration proceedings in the event further litigation became
necessary.  Id. at *4.

        Plaintiffs promptly commenced arbitration proceedings
against Chabra and Paran by filing, on April 6, 2005, a
supplemental statement of claim in the proceedings before the
AAA.  (PX O).  Instead of proceeding with the arbitration, AMC,
Chabra, and Paran immediately went to state court, in the Supreme
Court, New York County, petitioning to disqualify plaintiffs'
counsel from participating in the arbitration proceedings.
Moreover, after having moved before this Court to compel
arbitration, Chabra and Paran (and AMC) asked the state court for

_____

its principal place of business in New York.  (M. Israel Compl.
¶¶ 12, 13).  Hence, complete diversity exists in both actions.

a _stay_ of the arbitration proceedings, pending a decision on the disqualification motion. (PX P). On June 15, 2005, Justice Kibbie Payne denied the disqualification request, observing that Chabra, AMC, and Paran had waited "almost one year after the arbitration was commenced" to raise any objection to the representation of plaintiffs by their attorney. (_Id._ at 3). Justice Payne dismissed the petition, stating: "The timing of the petition is suspect and does not reflect favorably on petitioners' claim . . . ." (_Id._).

Rebuffed in their efforts to disqualify plaintiffs' counsel, defendants and AMC nonetheless continued their delaying tactics, as they then refused to pay the AAA their share of the arbitration fees and expenses. Under the AAA rules, arbitrators' compensation and administrative fees must be paid in advance, through "deposits," that are split between the parties (absent an agreement otherwise).[6] Here, the AAA asked plaintiffs and AMC to

---

[6] The arbitration was governed by the Commercial Rules of the AAA. (_See_ Pl. 2/27/06 First Letter to Court at 2-3 & Ex. E). Rule 50 thereof provided:

> The expenses of witnesses for either side shall be paid by the party producing such witnesses. All other expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and any witness and the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties.

(_Id._ Ex. E). Rule 52 provides that the AAA may require the parties to make deposits in advance of any hearings to cover the

deposit $36,440 each for the arbitrator's compensation, and plaintiffs alone were asked to pay a $2,500 case servicing fee. (Pl. 8/24/05 Letter to Court, Ex. B; Pl. 2/27/06 First Letter to Court at 3 & Ex. C).[7] Plaintiffs paid their deposit (and the case servicing fee), but Chabra, Paran, and AMC refused to pay their deposit, informing plaintiffs' counsel and the AAA that they did not owe any arbitration fees and therefore would not pay. They took the position that because plaintiffs commenced the arbitration, plaintiffs alone were responsible for the deposits. Defendants wrote to plaintiffs' counsel: "Your clients commenced this matter and are responsible for the payment of the panels' expenses for the arbitration." (PX Q; see also DX K; Def. Mem. at 16-17).[8]

---

arbitration expenses, with any unexpended funds to be returned to the parties following an accounting at the conclusion of the proceedings. (Id.).

[7] Although some of the paperwork referred only to AMC as the "respondent," it is clear that Chabra and Paran were also respondents and were being asked to pay their share of the arbitration fees. (See PX O, P, Q, R; DX K; Def. Mem. at 16-17). At some point in June 2005, AMC's assets were assigned for the benefit of creditors in state court proceedings, and AMC discontinued its involvement in the arbitration proceedings. (Def. Mem. at 16).

[8] Defendants' argument rests on the provision in the Employment Agreements that "'All attorneys' fees and costs of arbitration shall . . . in the first instance be borne by the respective party incurring such costs and fees . . . .'" (Def. Mem. at 16 (quoting PX E § 9.10(c))). The argument is specious. Defendants take the language out of context, as they fail to quote the remainder of the sentence: "but the arbitrators shall have the discretion to award costs and/or attorney's fees as they deem appropriate under the circumstances." (PX E § 9.10(c)). The clause is a fee-shifting provision, permitting the arbitrators to award costs and fees if appropriate. The sentence, taken in its entirety, cannot reasonably be construed

Because only plaintiffs' deposit was paid, by order dated June 29, 2005, the AAA suspended further proceedings and ordered the parties to pay the full deposits by July 27, 2005. (Pl. 8/24/05 Letter to Court, Ex. C). On August 15, 2005, the AAA wrote to the parties noting that it still had not received "Respondent's deposit of $36,440," referring to AMC, Chabra, and Paran in the singular as "Respondent." (DX K). The AAA also wrote, referring to plaintiffs in the singular as "Claimant":

> At this time, we are inquiring as to whether Claimant is willing to cover this deposit to continue the progress of this case. While we would prefer not to make this request of a party that has met its deposit obligations under the rules, the burden of funding this process falls on the parties and neither the AAA nor the neutrals can cover these costs.

(DX K).

By letter dated August 24, 2005, plaintiffs advised the Court that the arbitration proceedings had been suspended because defendants had failed to pay their share of the arbitration deposits. (Pl. 8/24/05 Letter to Court at 1 & Ex. C). Plaintiffs asked the Court to intervene.

On August 30, 2005, I issued an order noting that the Court did not have jurisdiction because the cases were closed. I specifically warned defendants, however, that "if the

---

to have required plaintiffs to advance defendants' share of costs. Under the AAA rules, absent an agreement otherwise, the arbitrators' compensation and administrative fees were to be split in the first instance by the parties; hence, the expenses were incurred by both sides, not just by plaintiffs. Moreover, defendants were the ones to require the expense to be incurred, as they demanded arbitration. Plaintiffs wanted to litigate in this Court, where no such expense would have been incurred.

arbitrations are dismissed because of defendants' failure to pay [their share of arbitration deposits], the Court will permit the plaintiffs to reinstate their lawsuits."

Defendants did not pay. Consequently, the arbitration panel terminated the proceeding as of October 5, 2005. (PX R).

By order dated October 28, 2005, I reinstated these actions and set a schedule for the briefing of plaintiffs' summary judgment motion. I also granted the request of defendants' prior counsel for leave to withdraw, and defendants' current attorneys were substituted into the case.

On November 9, 2005, defendants filed a notice of appeal of the Court's reinstatement of these actions.

Plaintiffs moved for summary judgment and sanctions on December 2, 2005. On January 12, 2006, defendants cross-moved to dismiss plaintiffs' actions or, in the alterative, to stay these proceedings pending a decision by the Second Circuit on the appeal from the order reinstating these cases and setting forth a schedule for the briefing of plaintiffs' summary judgment motion.

On February 24, 2006, I issued an order directing the parties to respond to certain questions by 5 p.m. on February 27, 2006. I also noted that the docket sheets for both cases showed that defendants never filed an answer, in either case. Defendants submitted answers electronically late on February 24, 2006, and, by letter dated February 24, 2006, requested leave after the fact to file the answers late. (Def. 2/24/06 Letter to Court at 1). On February 27, 2004, as noted above, plaintiffs

submitted two letters, one providing information responding to my inquiries and the other opposing defendants' request for leave to file the answers out-of-time.  Defendants did not respond to the questions of the Court by the February 27, 2006, deadline. Instead, they faxed a letter to the Court at 8:06 p.m., several hours after the deadline, requesting an extension.  The request is denied.

**DISCUSSION**

I discuss first the threshold issue of whether the appeal has divested this Court of jurisdiction; second the merits; third plaintiffs' request for sanctions; and fourth the amount of damages, fees, and costs.

**1.   Jurisdiction**

As a threshold matter, defendants argue that this Court has been divested of jurisdiction because of their appeal of the Court's October 28, 2005 order.  Putting aside the issue of whether the order is even appealable, the argument is rejected, for defendants ignore clear Second Circuit authority to the contrary.

In Motorola Credit Corp. v. Uzan, the Second Circuit held that the defendants' appeal of the district court's denial of their motion to compel arbitration did not deprive the district court of jurisdiction, in the absence of a stay from the Court of Appeals.  388 F.3d 39, 54 (2d Cir. 2004).  Adopting the Ninth Circuit's rationale in Britton v. Co-op Banking Group, 916 F.2d 1405, 1412 (9th Cir. 1990), the Second Circuit held that

"further district court proceedings in a case are not 'involved in' the appeal of an order refusing arbitration, and that a district court therefore has jurisdiction to proceed with a case absent a stay from this Court."  Motorola, 388 F.3d at 54. Though the reinstatement order did not expressly refuse arbitration, Motorola's rationale applies with even greater force where, as here, the Court previously granted defendants' motion to compel arbitration and arbitration proceedings were terminated because defendants failed to meet their obligations under the arbitration rules.

Defendants rely on a number of district court cases addressing whether an appeal from a decision denying arbitration divests the trial court of jurisdiction to proceed on the merits (Def. Mem. at 18), but these cases all pre-date Motorola and, to the extent they reach a result different from that reached in Motorola, they are no longer good law.  Accordingly, because the Second Circuit has not stayed these proceedings pending defendants' appeal, this Court is not divested of jurisdiction and defendants' motion to stay these proceedings is denied.

2.   **The Merits**

Plaintiffs' motion for summary judgment and defendants' cross-motion to dismiss raise three issues on the merits: (a) whether the interest rate to be applied to the bonus payments was a variable rate or a fixed rate; (b) whether notice was properly given to Chabra of AMC's default; and (c) whether plaintiffs and AMC agreed to a change in the terms of the pay-out without

Chabra's consent, such that he was relieved of his obligations under the Guarantees.

### a.    **The Interest Rate**

Plaintiffs argue that the interest rate was fixed at the prime rate set forth in the Wall Street Journal on the date of the closing of the restructuring agreement.  Defendants argue that the interest rate was floating.  For the reasons set forth below, I conclude that the Agreements, as amended, unambiguously provided that the interest rate was fixed.

### i.    **Rules of Contract Interpretation**

The rules of contract interpretation are well-settled and are set forth in the summary judgment context in <u>Seiden Associates, Inc. v. ANC Holdings, Inc.</u>, 959 F.2d 425 (2d Cir. 1992):

> In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use.  When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity.  Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate, since it is only when there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law.

<u>Id.</u> at 428 (internal citations omitted); <u>see</u> <u>also</u> <u>Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan</u>, 7 F.3d

1091, 1094 (2d Cir. 1993) ("summary judgment may be granted only
where the agreement's language is unambiguous and conveys a
definite meaning"); Nycal Corp. v. Inoco PLC, 988 F. Supp. 296,
298 (S.D.N.Y. 1997) (summary judgment "is clearly permissible
when the language of the contract provision in question is
unambiguous") (citations omitted), aff'd, 166 F.3d 1201 (2d Cir
1998).  Therefore, in a contract interpretation case under New
York law,[9] the Court must first decide whether the contract is
ambiguous.  See Morse/Diesel, Inc. v. Trinity Indus., Inc., 67
F.3d 435, 443 (2d Cir. 1995) (citing Sayers, 7 F.3d at 1094).

        A contractual provision will be deemed ambiguous
"whenever it admits of more than one interpretation 'when viewed
objectively by a reasonably intelligent person who has examined
the context of the entire integrated agreement and who is
cognizant of the customs, practices, usages and terminology as
generally understood in a particular trade or business.'"  MG
Ref. & Mktg., Inc. v. Knight Enters., Inc., 25 F. Supp. 2d 175,
180 (S.D.N.Y. 1998) (quoting Nowak v. Ironworkers Local 6 Pension
Fund, 81 F.3d 1182, 1192 (2d Cir. 1996)).  Conversely, contract
language is not ambiguous if it has "a definite and precise
meaning, unattended by danger of misconception in the purport of
the [contract] itself, and concerning which there is no
reasonable basis for a difference of opinion."  Sayers, 7 F.3d at
1095 (quoting Breed v. Ins. Co. of North America, 46 N.Y.2d 351,

---

        [9]    The Employment Agreements contain a New York choice of
law clause.  (PX E-1, E-2 § 9.4).  The Guarantees contain a
similar provision.  (PX I-1, I-2 at 2).

355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)).

Moreover, "'[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation. The court is not required to find the language ambiguous where the interpretation urged by one party would 'strain[] the contract language beyond its reasonable and ordinary meaning.'" Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957)).

If the agreement sets forth the parties' intent clearly and unambiguously, the Court may not look to extrinsic evidence to determine the parties' obligations under the contract. See Stroll v. Epstein, 818 F. Supp. 640, 643 (S.D.N.Y. 1993), aff'd, 9 F.3d 1537 (2d Cir. 1993); Teitelbaum Holdings, Ltd. v. Gold, 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 396 N.E.2d 1029 (1979). If the language of a contract is ambiguous, however, "extrinsic evidence of the parties' intent is admissible." Space Imaging Europe, Ltd. v. Space Imaging L.P., 38 F. Supp. 2d 326, 334 (S.D.N.Y. 1999) (citing Seiden Assocs., 959 F.2d at 428).

## ii. **Application**

Applying these well-settled principles of contract interpretation to the facts of this case, I conclude as a matter of law that the Agreements, as amended, unambiguously provided that the interest rate would be fixed.

First, the language of the Agreements, as amended, is

clear and unambiguous and conveys a definite meaning.  The First

Amendment expressly provides that the "bonus payment[s] will be

payable over three years in the manner set forth below with

interest accruing at a rate equal to the Prime Rate plus 1%.

'Prime Rate' means the prime rate of interest as set forth in The

Wall Street Journal on the date of the Closing."  (PX F-1, F-2 at

§ 3.4 (emphasis added)).  The "Closing" is a defined term -- "the

closing of the merger contemplated by the Merger Agreement."

(Id.).  The "Merger Agreement" is also a defined term, and is

defined in the Employment Agreements.  (Id.; see PX E-1, E-2 at

1).  The only reasonable construction of this language is that

the interest rate was fixed at whatever the prime rate was as

published in the Wall Street Journal on the date of the closing

of the contemplated merger, plus 1%.[10]

        Second, defendants' position that the rate is a

variable or fluctuating rate is belied by the cardinal rule,

recognized by defendants, that a contract should be interpreted

so that no portion of the contract is rendered meaningless.

(Def. Mem. at 9 (citing Petracca v, Petracca, 756 N.Y.S.2d 587,

---

        [10]    Section 3.4 of the First Amendment is the only
provision in the Agreements specifically addressing how the rate
was to be set.  The Letter of Intent and Employment Agreements do
not specify whether the interest rate is to be fixed, variable,
or floating.  Rather, the Letter of Intent provides that the
bonus payments would accrue interest at "an annual rate equal to
prime rate plus 1%."  (Def. Mem. at 7).  The Employment
Agreements make no explicit reference to the interest rate but
incorporate by reference the Letter of Intent.  The Second
Amendment does not alter the terms of the First Amendment and
expressly refers to Section 3.4 as establishing the rate of
interest in a "whereas" clause.  (PX J-1, J-2 at 1).

588 (2d Dept 2003)).  Defendants' position that the interest rate was variable or floating would require the Court to ignore the words "as set forth in The Wall Street Journal on the date of the Closing."

Third, defendants' position is also belied by the absence of any language providing for how a variable rate would be determined.  The only reference to fixing the rate is the reference to "the date of the Closing," as discussed above.  If the parties had intended to have the rate fluctuate or float according to variances in the prime rate, they would have had to provide further terms: how often the rate would be adjusted, i.e., each day, each month, each year, or some other period of time; on which date of the period in question the rate would be adjusted, i.e., the first day of each month, the last day of each year, or some other specified date; whether the rate would be capped on a yearly basis or over the life of the Agreements; and whether there was a minimum rate, i.e., a rate below which the interest rate could not go.  Such terms are typical of an agreement calling for a variable rate.  The absence of any provisions setting forth such terms is strong proof that the parties did not intend the rate to be floating or variable.

Defendants argue that the use of the term "prime rate plus" proves that the parties intended the rate to be a floating or variable one, citing cases for the proposition.  (Def. Mem. at 8).  The argument is rejected.  Although the words "prime rate plus" can suggest a floating or variable rate, they can just as

easily reflect an agreement to set the rate as of a particular date, when there is some uncertainty as to when a triggering event will occur. Here, the parties were unsure as to whether and, if so, when the contemplated merger would close (see Chabra 1/31/06 Reply Aff. ¶ 2 ("The closing date of the Maplewood transaction was a moving target in 2000. No one was sure exactly what day the transaction would be completed.")); they therefore agreed to "prime plus one" as of the date, whenever it was, the transaction closed. This was still a fixed rate -- fixed as of the date the triggering event occurred.

Second, the cases relied on by defendants do not require a different result. Two of the cases involve contracts that expressly described the interest rates as "floating" or "variable." See A.F.L. Falck, S.p.A. v. E.A. Karay Co, No. 85 Civ. 1998 (RWS), 1990 WL 145583, *2 (S.D.N.Y. Sept. 28, 1990) (describing the interest rate set forth in the contract as "a floating rate equivalent to the prime rate plus four percent, but not to exceed twenty-five percent annually"); Gen. Elec. Co. v. Compaanie Euralair, S.A., No. 96 Civ. 0884 (SAS), 1997 WL 397627, *2 (S.D.N.Y. July 3, 1997), aff'd, 164 F.3d 617 (2d Cir. 1998) (quoting the contract as providing that the principal amount shall bear interest "at a rate per annum equal to the Variable Rate") (adopting Magistrate Judge Peck's recommendation and report). Defendants' reliance on Haroco, Inc. v. Am. Nat'l Bank And Trust Co. of Chicago, 38 F.3d 1429, 1434 (7th Cir. 1994), is similarly misplaced. There, the Seventh Circuit was called upon

to analyze banks' methods for setting prime rates, determining whether a bank "is obligated to set the prime rate based upon the actual rate of interest it charges on any particular loan."  Id. at 1435.  Hence, Haroco involved a contract in which the prime rate at issue was determined by a party to the contract; in contrast, here, the interest rate was tied to the prime rate set by a non-party on a fixed date.  Id.

Defendants cite to no additional case law to support their interpretation of "prime rate plus" but rather repeat their conclusory allegation that the Letter of Intent clearly established that the interest rate was floating.  (Def. Mem. at 7, 8, 10).  Even assuming, however, that defendants' interpretation of the language in the Letter of Intent is correct, the First Amendment modified the Agreements and clearly and unambiguously provided that the interest rate was to be fixed, at prime plus one as of "the date of the Closing." Accordingly, I reject defendants' argument that the phrase "prime rate plus 1%" establishes that the rate here was variable.

Defendants further suggest that the reference to the date of closing was "intended merely to define the date upon which interest began to accrue."  (Def. Mem. at 8).  The argument is absurd and would require the Court to "'strain[] the contract language beyond its reasonable and ordinary meaning.'"  Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957)).  Though

the First Amendment provided that plaintiffs would be entitled to receive bonus payments upon the closing of the merger, with the first installment due three months after the date of closing, it also unambiguously described the prime rate as that set forth in the Wall Street Journal on the date of the closing.  Again, defendant's argument would require the Court to ignore the clear and unambiguous language of the contract.

Defendants offer parol evidence of alleged prior negotiations or agreements.  First, these documents are inadmissible.  As the First Amendment sets forth the parties' intent clearly and unambiguously, the Court may not look to extrinsic evidence to determine the parties' obligations under the Agreements.  Stroll v. Epstein, 818 F. Supp. 640, 643 (S.D.N.Y. 1993), aff'd, 9 F.3d 1537 (2d Cir. 1993); Teitelbaum Holdings, Ltd. v. Gold, 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 396 N.E.2d 1029 (1979).  Second, even assuming the Court could consider these documents, the evidence cited by defendants is not probative.  Chabra's conclusory assertion that "I understood that that [sic] plaintiffs wanted a floating rate" (DX 2 ¶ 4) is belied by the language of the Agreements.  Defendants also rely on emails written by former attorneys for defendants several years after the fact stating that their recollection was that the rate would be floating; these unsworn e-mails are pure hearsay and are inadmissible.  (DX A).  Defendants further cite to a document signed by Steven Israel in which he ambiguously indicated next to a description of the interest rate as "10.5%

current" that the rate was tied to the "Agreement." (DX E). The relevance of the remainder of the evidence cited by defendants turns on the rejected interpretation that "Prime Plus 1%" indicates that the rate was to be floating. (DX B, C, D).

Finally, if I were to consider parol evidence, I would also consider the black-lined draft of the First Amendment, which shows that the parties contemplated a provision calling for a variable rate but then deleted that language in favor of the language setting the prime rate as fixed as of the date of the closing. An earlier draft read: "'Prime Rate' means, with respect to each payment date, the prime rate of interest as set forth in The Wall Street Journal two business days before the related interest accrual period . . . ." (PX G-1, G-2 § 3.4). The underscored words were deleted from the final draft. In addition, the following sentence was also deleted: "In the event that the Prime Rate changes, Employer will recalculate the amount of the remaining installments based on the then current Prime Rate . . . ." (Id.). By deleting these words and adopting the final definition of "Prime Rate," the parties clearly were seeking to implement their intent to provide for a fixed rate.

The parties' course of conduct is also strong parol evidence of their intent to provide for a fixed rate. In the Second Amendment, when they agreed and acknowledged that the amount due, including accrued and unpaid interest, was $713,621.49, they applied a fixed 10.5% rate. When they agreed on a revised schedule of payments, which they set out in the

Second Amendment, they similarly used a fixed rate of 10.5%. (Pl. 2/27/06 First Letter to Court at 1-2). The fact that the parties actually applied a fixed 10.5% rate in April 2003, some three years after they entered into the Agreements and even though the prime rate had dropped in the meantime, to calculate the interest is strong proof that they believed they had contracted to use a fixed rate.

For the reasons set forth above, I conclude that the Agreements, as amended, unambiguously provided that the interest rate was fixed at 1% above the prime rate set forth in the Wall Street Journal on the date of the closing of the restructuring agreement.

**b.** **Notice**

Defendants further argue that summary judgment should be denied and that the Court should grant summary judgment in favor of defendants because plaintiffs failed to give notice of default to Chabra. The Guarantees expressly provided that Chabra's obligations would "be paid when due without presentation, demand, notice, or protest of any kind . . . provided, however, that [plaintiffs] give Guarantor written notice ("Notice") of AMC's failure to pay any Obligation within 60 days of occurrence of each failure." (PX I) (emphasis in original). Defendants claim that AMC was in default as early as December 2000, but Chabra did not receive notice of any default until March 31, 2004. (Def. Mem. at 13). Plaintiffs maintain that AMC did not default until February 15, 2004, and that,

accordingly, they provided timely notice to Chabra as they provided numerous notices starting on March 31, 2004. (PX A ¶¶ 8, 9, 10; PX B ¶¶ 8, 9, 10; PX L, M).

Defendants' arguments are rejected. First, although AMC clearly was having difficulty making the payments on a timely basis prior to 2004, the difficulties were resolved, in part because plaintiffs were willing to make an accommodation. Indeed, plaintiffs sent default notices -- which were copied to Chabra, both individually and as President and CEO of AMC -- in February and March 2003. (Novak 1/27/06 Aff. Ex. A). Those notices led to the discussions that resulted in the Second Amendment, which was executed in April 2003. (PX J-1, J-2). Plaintiffs are not seeking to recover for the earlier defaults, assuming they were defaults; these purported earlier defaults were cured.[11]

Second, on this record, a reasonable jury could only find that AMC made payments through February 15, 2004. Both plaintiffs have so stated under oath (PX A ¶ 8; B ¶ 8), while, in contrast, Chabra declares only that "I do not know when AMC made payments to the plaintiffs and when they stopped." (DX 2 ¶

---

[11]     The notice provision of the Guarantees expressly provides that notice must be given as to each default. (PX I at 1). The unambiguous meaning is that, for each default by AMC, plaintiffs were to provide notice to Chabra within sixty days. Contrary to defendants' suggestion, however, the Guarantees do not provide that, if plaintiffs failed to provide timely notice for any one default, they forfeited their rights to collect on any default.

26).[12]  AMC defaulted on the next payment.  Because plaintiffs

sent Chabra numerous notices of AMC's default starting March 31,

2004, well within 60 days, they complied with the notice

provision of the Guarantees.

### c.  The Purported Release or Novation

Chabra argues that he is not liable under the

Guarantees because he did not consent to the Second Amendment.

(Def. Mem. at 14-15).  Although Chabra acknowledges that he

signed the Second Amendment "in his corporate capacity," he

contends that he never signed it in his "personal capacity."

(Id. at 16).  The argument is without merit.

Two related legal concepts are potentially implicated.

First, "when the terms of the contract guaranteed have been

changed or the contract, as finally made, is not the one upon

which the surety agreed to become bound, he will be released."

Banco Portugues do Atlantico v. Asland, S.A., 745 F. Supp. 962,

968-70 (S.D.N.Y. 1990) (internal quotations and citations

omitted).  Second, when there is a novation, a new contract

replaces and extinguishes the prior contract.  Under New York

law, a novation requires proof of four elements: "(1) a

---

[12]     To the extent defendants rely on Exhibit G, a document
allegedly found in AMC's files that purports to list the AMC
payments to plaintiffs, the reliance is misplaced.  Exhibit G
indicates that AMC made payments to plaintiffs until March 2004,
the same month notice of default was provided to Chabra.
Moreover, Exhibit G is problematic: it is not signed; it is not
clear who the author is; and it is not clear on what basis it is
admissible.  Indeed, Chabra himself calls the reliability of this
document into question.  (See Chabra Aff. ¶ 28 ("[i]f this chart
is accurate")).

previously valid obligation; (2) agreement of all parties to a new contract; (3) extinguishment of the old contract; and (4) a valid new contract."  In re Balfour MacLaine Int'l Ltd., 85 F.3d 68, 82-83 (2d Cir. 1996) (citing Healey v. Healey, 594 N.Y.S.2d 90, 91 (3d Dep't 1993)).  Here, neither concept is of help to defendants.

First, of course, Chabra did consent to the Second Amendment.  He signed it, was aware of its terms, and agreed to it on behalf of AMC.  The Second Amendment specifically referred to Chabra and his obligations under the Guarantees: "It is the intention of the parties that the [Guarantees] by and among Employee[s] and Surinder (Sonny) Chabra shall continue in full force and effect . . . ."  (PX J-1, J-2).  If Chabra had actually objected to the Second Amendment, he would not have signed it.  But he did so, indicating his consent in writing.  The argument that he signed it only in his corporate capacity and not in his individual capacity elevates form over substance.

Second, even assuming Chabra's signature was not sufficient to constitute a signature by him as Guarantor, the Second Amendment did not alter the terms of the Agreements in such a manner as to release Chabra from his obligations in any event.  The Guarantees specifically provided that "[t]he liability of the Guarantor under th[ese] Guarant[ees] shall be absolute and unconditional irrespective of (i) . . . any change in the time, manner or place of payment of, or in any other term of, all or any of such provisions or the Obligations."  (PX I).

Hence, the Guarantees expressly permitted the timing of payments to be altered, and that is all the Second Amendment did -- it revised the schedule of payments. Chabra's undertaking was not altered, and new obligations were not created. If anything, the Second Amendment worked to Chabra's advantage as it gave AMC an additional opportunity to cure its default; plaintiffs could have instead exercised their rights against Chabra under the Guarantees at that time.

Third, no reasonable jury could find that the Guarantees were extinguished by the Second Amendment. The Second Amendment only revised the timing of the payments; the other provisions remained in effect.

Accordingly, defendants' argument that the Second Amendment released Chabra from liability is rejected.

**3. Sanctions**

Plaintiffs move for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. The conduct of defendants and their attorneys is indeed troubling, as they have engaged in a pattern of delay and obfuscation. For example:

- After successfully moving to compel arbitration in this Court, instead of proceeding to arbitration they filed a petition in state court to disqualify plaintiffs' counsel from participating in the arbitration proceedings.

- Having moved in this Court to compel arbitration, defendants asked the state court for a <u>stay</u> of arbitration.

- The petition to disqualify was not filed until

almost a year after the arbitration proceedings had been commenced.

- The petition to disqualify was filed even though defendants never objected to plaintiffs' counsel's participation in this lawsuit.

- Defendants then refused to pay their deposit for the arbitration fees and costs, even though they had insisted on arbitration, causing the arbitration proceedings to be terminated.

- Defendants argued that plaintiffs were obliged to pay defendants' share of the arbitration fees and costs even though the AAA billed defendants for their half and defendants were the ones to insist on arbitration in the first place.

- Although they had caused the arbitration proceedings to be terminated, defendants still objected to the reinstatement of this case.

- Defendants and their lawyers argued that this Court had been divested of jurisdiction by their appeal, when Second Circuit law squarely held otherwise; defendants and their lawyers ignored the controlling Second Circuit precedent and relied instead on district court cases that pre-dated the Second Circuit case.

- Defendants made arguments on these motions that ignore clear language in the Agreements.

Notwithstanding the above, I need not decide whether defendants and their lawyers have violated their obligations

under Rule 11, for the Agreements, as amended, provide plaintiffs with the contractual right to recover attorneys' fees and costs incurred in connection with their collection efforts. Amendment No. 1 to the Employment Agreements provides that AMC "agrees to pay all reasonable costs incurred in connection with the collection of amounts payable under this Section 3.4." (PX F-1, F-2 § 3.4). Amendment No. 1 to the Letter of Intent provides that "Chabra shall guaranty the payments referenced in [Amendment No. 1 to the Employment Agreements]." (PX H-1, H-2 at 2). The Guarantees provide that Chabra will be liable for "any and all losses, costs, damages, claims, expenses and liabilities (including reasonable attorneys' fees) incurred by [plaintiffs] in enforcing any rights under th[ese] Guarant[ees]." (PX I-1, I-2 at 1).

Under these provisions, plaintiffs are entitled to recover from Chabra their reasonable attorneys' fees and costs incurred in their efforts to collect the bonus payments, including their fees and costs incurred in connection with the arbitration proceedings, the state court proceedings, and the proceedings in this Court.

## 4. **Damages, Fees, and Costs**

On the record before the Court, a reasonable jury could only find that plaintiffs are each owed $275,055.02 in unpaid bonus monies plus accrued interest as of December 5, 2005 of $50,541.36, with interest accruing thereafter at 10.5% per annum, or $2,406.73 per month. Both plaintiffs have submitted

affidavits based on personal knowledge swearing to these facts. (PX A ¶¶ 9, 13-16; PX B ¶¶ 9, 13-16). Defendants have not submitted any concrete, admissible evidence to controvert these facts.[13] Accordingly, plaintiffs are each entitled to recover $275,055.02 in unpaid bonus monies plus $50,541.36 in unpaid interest accrued through December 5, 2005, plus $7,220.19 in interest for December 6, 2005, through March 5, 2006 ($2,406.73/month x three months) for a total of $332,816.57 (as of March 5, 2006).

Plaintiffs have also incurred attorneys' fees and costs in connection with their collection efforts. As of December 1, 2005, they had paid fees and costs of $127,751.62 and owed (but had not yet paid) another $16,382.95 in fees. (PX A ¶ 20; PX B ¶ 20; PX C ¶ 5). These numbers do not reflect time spent on the matter since April 1, 2005, which was the effective date of a new retainer agreement between plaintiffs and their attorneys, shifting from an hourly fee arrangement to a contingency. (PX U). From that date forward, plaintiffs remained responsible for costs but the fees would be based on the contingency arrangement. (Id. 1-2). Plaintiffs have submitted invoices and a print-out, but these only show the services rendered through October 31, 2005. (PX V).

I will not award fees under the Agreements on a contingency basis, but I will award fees and costs based on a

---

[13]     Defendants argue that plaintiffs' Rule 56.1 Statement is incomplete because documentary evidence as to the damages calculations is missing. The objection is overruled.

lodestar method.  The rates applied by plaintiffs' counsel are
reasonable.  I will award the $127,751.62 paid through December
2, 2005 as well as the additional $16,382.95 in fees billed (as
of March 31, 2005) but not paid.  Based on my review of the
record, I conclude that these amounts are fair and reasonable.
In addition, I will award fees for the time spent from April 1,
2005 to date (assuming they are reasonable), including the time
spent preparing the reply papers, reviewing defendants' sur-reply
papers, and responding to the Court's recent inquiry, plus any
additional costs not covered by the above amounts (assuming they
are reasonable).  Plaintiffs' counsel shall submit an affidavit
setting forth these amounts.  He need not re-submit the materials
already part of the record.

## CONCLUSION

        For the reasons set forth above, plaintiffs' motion for
summary judgment is granted to the extent that I hold that Chabra
is liable on the Guarantees for the unpaid bonus payments,
interest thereon calculated using a fixed annual rate of 10.5%,
and reasonable attorneys' fees and costs.  Plaintiffs' motion for
sanctions is denied, in light of the Court's award of fees and
costs under the Agreements.  Defendants' cross-motion is denied
in all respects.

        Judgment will be entered in favor of Steven Israel
against Chabra in action no. 04 Civ. 5859 in the sum of
$332,816.57 (which includes interest through March 5, 2006) and
in favor of Michael Israel against Chabra in action no. 04 Civ.

4599 in the sum of $332,816.57 (which includes interest through March 5, 2006). Interest shall continue to accrue at the fixed rate of 10.5% per annum until Chabra's obligations are met in full.

A supplemental judgment will be entered for the award of attorneys' fees and costs. Plaintiffs' counsel shall submit an affidavit setting forth the fees and costs by March 6, 2006 and defendants' objections, if any, shall be submitted by March 13, 2006.

Although claims remain against Paran, I find, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, that no just reason exists to delay entry of judgment against Chabra until resolution of the claims against Paran, for the latter claims are veil-piercing claims that are separate and distinct from the claims resolved herein, and this matter has been delayed far too long by defendants' tactics. Accordingly, the Clerk of the Court is directed to enter judgment in both cases forthwith against Chabra as set forth above, and to enter supplemental judgments following my ruling on the amount of fees and costs.

Defendants' request for leave to file late answers is denied as to Chabra. In light of the discussion above, no meritorious defense can be shown. I reserve decision as to the request for leave to file a late answer as to Paran.

A pretrial conference will be held on March 31, 2006, at 10:00 a.m., to discuss the remaining claims against Paran.

SO ORDERED.

Dated:    New York, New York
          February 28, 2006

                                    DENNY CHIN
                                    United States District Judge